**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 24-215-DLB-CJS**

**BRANDON RETTIG**                                                              **PLAINTIFF**

**v.**                              **MEMORANDUM OPINION AND ORDER**

**CITY OF NEWPORT and RONALD LALUMANDIER**                  **DEFENDANTS**

\* \* \* \* \* \* \* \* \* \*

This matter is before the Court on the Motion for Summary Judgment (Doc. # 21) filed by Defendants the City of Newport and Ronald Lalumandier (collectively, "Defendants").  Plaintiff Brandon Rettig filed a Response in Opposition (Doc. # 30), Defendants replied (Doc. # 35), and the matter is ripe for the Court's review.  For the following reasons, Defendants' Motion (Doc. # 21) is **granted**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

In the early morning hours of June 8, 2024, officers with the Newport Police Department responded to a call that a fight had broken out in the public parking lot of the Holiday House liquor store in Newport, Kentucky.[1]  (Doc. # 25 at 7:9-23).  At approximately 12:06 a.m., Newport Police Officer Ronald Lalumandier arrived on scene and observed a woman ("the female victim") and a man in conversation with Officer Patrick Reynolds, also of the Newport Police Department.  (Doc. # 23 at 0:23-0:33).  According to Lalumandier, the female victim appeared "upset" and had a bloody nose.

---

[1]     The basic facts in this case are largely undisputed and are well-documented by video and audio recordings captured by Officers Lalumandier and Reynolds's body-worn cameras.  (*See* Docs. # 23 and 29).

1

(Doc. # 25 at 8:19-9:12).  The public parking lot in which these events took place is situated on a busy street near Newport on the Levee.  (Doc. # 26 at 53:9-23).  The area is home to many popular bars and restaurants and is often crowded at night.  (*Id.* at 54:6-11).  Several pedestrians can be observed in the body-worn camera footage, including two groups of motorcyclists.  (*See, e.g.*, Doc. # 23 at 01:40-02:38; 5:30-6:10).  Indeed, Officer Reynolds testified to the chaotic nature of the scene, characterizing it as a "shit show."  (Doc. # 26-1 at 12:9-11).

Brandon Rettig's introduction to the situation amplified this chaos.  At approximately 12:15 a.m., Rettig appeared on a third-floor balcony of the Academy on Fourth (the "Academy"), a large apartment complex which abuts the Holiday House parking lot.  (Doc. # 23 at 8:53-9:01).  Rettig lived at the Academy.  (Doc. # 24 at 8:3-16).  On the night in question, Rettig had attended a Cincinnati Reds game, from which he returned at approximately 11:30 p.m.  (*Id.* at 39:8-13).  Over the course of the evening, Rettig had consumed several alcoholic beverages, both before and during the game.  (*Id.* at 38:10-39:13).  After returning to the Academy, Rettig went to check on his girlfriend's cat in her apartment which, like Rettig's, was on the third floor.  (*Id.* at 43:10-15).  The flashing lights and sirens outside drew Rettig's attention and he exited onto the balcony.  (*Id.* at 44:6-9).  Shortly after he appeared on the balcony Rettig started yelling down to the parking lot.  (*Id.* at 46:12-15).  Rettig does not know why he started yelling but believes that his intoxication "[p]robably was involved in that [decision.]"  (*Id.* at 46:16-19).  Rettig shouted, "Y'all look stupid[.]"[2]  (*Id.* at 8:59-9:08).  He continued to shout "stupid," and

---

[2]     Although the parties do not dispute the content of Rettig's initial shouts, they diverge in their interpretation of Rettig's targeted audience.  Rettig contends that these insults were "criticism" directed at police officers.  (Doc. # 30 at 6).  Defendants, however, claim that Rettig's shouts were aimed at the entire group gathered in the parking lot.  (Doc. # 21 at 1).

2

"retards" for about twenty seconds until the female victim began to shout in response. (Doc. # 23 at 9:00-9:22).  Then, Rettig stopped shouting for nearly three minutes.  (*Id.* at 9:35-12:30).  However, Rettig and the female victim soon renewed hostilities.  After Rettig shouted "figure it out," down at the scene, the female victim yelled that Rettig "look[ed] gay."  (Doc. # 29 at 13:15-13:25).  She then asked whether Rettig was "celebrating pride month" before informing him that he "fit the criteria for pride month."  (*Id.*).  Rettig, for his part, shouted that the female victim "fit the criteria for jail" and urged her to "have fun in jail."  (*Id.* at 13:25-30).  The female victim then shouted at Rettig to "go back inside and take it in the ass."  (*Id.* at 13:30-35).  After about forty-five seconds, Officer Reynolds directed Rettig to stop and warned Rettig that if he yelled again, he would be arrested. (Doc. # 29 at 14:00-14:10).   At the same time, Lalumandier told the female victim that she would be placed under arrest for disorderly conduct if she continued to yell.  (Doc. # 23 at 13:20-13:35).  Despite Officer Reynolds's warning, Rettig continued to yell at the scene below.  (*Id.* at 13:35-13:42).  Lalumandier then shouted "enough," at Rettig, who responded "you suck."  (*Id.* at 13:40-13:47).  Lalumandier warned Rettig again stating, "keep it up and I'll take your ass to jail."  (*Id.* at 13:48-13:51).  Rettig replied "First Amendment, buddy" and raised his middle finger.  (*Id.* at 13:50-13:58).  Lalumandier remarked, "Fuck it.  Works for me" and set off toward the Academy.  (*Id.*).  Rettig continued to shout at Lalumandier as he walked toward the Academy.  (*Id.* at 13:57-14:06).

Lalumandier used an electronic key fob to enter the Academy through a locked door.  (Doc. # 25 at 23:23-24:1).  Although Lalumandier had previously lived at the Academy as a tenant, he used a key fob he had received from Melissa McIntyre—the

3

Academy's property manager.   (*Id.* at 17:12-18:10).   This key fob only allowed Lalumandier to access the Academy's common areas.  (Doc. # 35-1 ¶ 6).  McIntyre did not place any restrictions on Lalumandier's use of the key fob.  (Doc. # 25 at 52:14-16; *Id.* ¶ 8).  Lalumandier entered the Academy accompanied by Officer Reynolds and Officer Samples, another Newport Police Officer.  (*Id.* at 23:20-22).

Once inside, the three officers immediately used the key fob to take an elevator to the third floor.  (Doc. # 23 at 14:30-14:40).  Lalumandier knocked on the door of the unit attached to the balcony on which Rettig was standing.  (*Id.* at 15:40-15:45).  When no one answered, Lalumandier called McIntyre to ask who lived in the unit.  (*Id.* at 16:18-16:55).  McIntyre informed Lalumandier that the apartment belonged to Sierra Stepp.  (*Id.* at 19:25-19:45).  After several minutes of officers knocking and calling for any occupants to exit the apartment, Rettig appeared at the opposite end of the hallway and announced that he was Sierra's boyfriend.   (*Id.* at 15:45-20:25; Doc. # 25 at 27:21-28:5).   He explained that Sierra was out of town and that nobody was in her apartment.  (*Id.* at 20:20-20:30).  Officer Lalumandier observed that Rettig had glassy eyes, slurred his speech, and smelled of alcohol.  (Doc. # 25 at 31:11-31:16).  Eventually, Officer Reynolds realized that Rettig—who had changed clothes in an effort to avoid detection—was the same person who had been shouting from the balcony.  (Doc. # 23 at 21:05-21:20; Doc. # 24 at 61:10-16).  Although Rettig denied that he was the one yelling from the balcony when confronted in the hallway, he now admits that he was the one yelling.  (Doc. # 30 at 4). After Rettig refused to disclose how much he had had to drink that night, Lalumandier placed him under arrest.  (Doc. # 23 at 23:00-23:20).  Lalumandier transported Rettig to the Campbell County Detention Center.  (Doc. # 24 at 70:14-18).  Rettig was bonded out

4

a few hours later and charged with alcohol intoxication in violation of KRS 222.202(1). (*Id.* at 75:24-25; Doc. # 21-2 at 1). This charge was ultimately dismissed after Rettig successfully completed judicial diversion. (Doc. # 21 at 5 (citing *Commonwealth v. Rettig, Brandon Lee*, 24-M-00698); *see also* Doc. # 24 at 90:14-20).

Rettig filed the Complaint in this action on December 10, 2024, bringing claims under 42 U.S.C. § 1983 against Lalumandier and the City of Newport and a claim against Lalumandier for common law battery. (Doc. # 1). On February 2, 2026, Defendants moved for summary judgment on Rettig's claims. (Doc. # 21). Rettig filed his Response on February 23, 2026 (Doc. # 30) and Defendants replied on March 16, 2026 (Doc. # 35). Accordingly, this matter is ripe for the Court's review.

## II.    STANDARD OF REVIEW

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Peffer v. Stephens*, 880 F.3d 256, 262 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When evaluating a motion for summary judgment, "the evidence is construed and all reasonable inferences are drawn in favor of the nonmoving party." *Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013) (citation omitted). At the summary judgment stage, the Court "must not make credibility determinations, weigh the respective value of evidence, or resolve material factual disputes." *Alman v. Reed*, 703 F.3d 887, 895 (6th Cir. 2013).

At the outset, the moving party bears "the burden of showing the absence of a genuine issue as to any material fact[.]" *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the movant has satisfied this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the non-moving party must identify evidence showing that a genuine factual issue remains. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000). The trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Instead, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001). Where, as here, the parties submit video footage of an incident, the Court must "view the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381 (2007).

## III.    ANALYSIS

Rettig's Complaint raises several claims, including retaliatory arrest in violation of the First Amendment (Count I), "malicious arrest, malicious prosecution, excessive force, and unlawful seizure of person" in violation of the Fourth Amendment (Count II), battery (Count III), and—although not clearly identified as separate counts—claims for warrantless entry in violation of the Fourth Amendment and municipal liability against Newport. The Court turns first to Rettig's claims under the Fourth Amendment.

6

### A.    Qualified Immunity

Because Lalumandier has raised qualified immunity as a defense to Rettig's § 1983 claims under the First and Fourth Amendments, the Court must first address his immunity defense before turning to the merits of these claims.  (Doc. # 21 at 12).

Qualified immunity balances the need to hold public officials accountable for unconstitutional and illegal actions against "the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  Accordingly, this defense shields a defendant from liability unless, viewing the evidence in the light most favorable to the plaintiff, a reasonable juror could find that: (1) the defendant violated a constitutional right; and (2) that right was clearly established.  *Kovacic v. Cuyahoga Cnty. Dep't. of Children and Family Servs.*, 724 F.3d 687, 695 (6th Cir. 2013) (quoting *Morrison v. Bd. of Trustees*, 583 F.3d 394, 400 (6th Cir. 2009)).  A right is "clearly established" if the "contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful," but the action's unlawfulness must have been apparent in light of pre-existing law.  *Id.* (citations omitted).  So, a plaintiff need not "point to a case 'on all fours with the instant fact pattern to form the basis of a clearly established right,'" but he must identify "a sufficiently analogous case (or cases) from which a 'reasonable official would understand that what he is doing violates that right.'"  *Rhodes v. Michigan*, 10 F.4th 665, 679 (6th Cir. 2021) (first quoting *Vanderhoef v. Dixon*, 938 F.3d 271, 278 (6th Cir. 2019); then quoting *Anderson*, 483 U.S. at 640).

7

"Where a defendant raises the defense of qualified immunity, 'it is the plaintiff's burden to show that the defendant[ is] not entitled to qualified immunity.'" *Moody v. Mich. Gaming Control Bd.*, 871 F.3d 420, 425 (6th Cir. 2017) (quoting *Burgess*, 735 F.3d at 472).  Thus, Rettig bears the burden of demonstrating that Lalumandier is not entitled to qualified immunity.

### B.      Fourth Amendment Claims

Rettig argues that Officer Lalumandier violated his Fourth Amendment rights in multiple ways.[3]  First, Rettig alleges that he was unlawfully seized and subjected to a false arrest because Lalumandier lacked probable cause to arrest him.  (Doc. # 1 ¶¶ 78-79).  Second, Rettig contends that Lalumandier lacked probable cause to issue a citation for alcohol intoxication in violation of KRS 222.202.  (*Id.* ¶ 78).  Consequently, Rettig claims that he was subjected to a malicious prosecution.  (*Id.*).  Finally, Rettig argues that Lalumandier used excessive force in effectuating his arrest.  (*Id.* ¶ 80).

In his Motion for Summary Judgment, Lalumandier asserts that all Rettig's Fourth Amendment claims rise or, in his opinion, fall with the existence of probable cause.  (Doc. # 21 at 7) ("Each of Rettig's Fourth Amendment claims – malicious arrest, malicious

---

[3]      Although Rettig brings his Fourth Amendment claims against both Lalumandier—in his official and individual capacities—and Newport, Lalumandier is the only proper defendant. Although municipalities like Newport can be liable under § 1983, they "cannot be liable for the constitutional torts of [their] employees." *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007) (citation omitted); *see also D'Ambrosio v. Marino*, 747 F.3d 368, 388-89 (6th Cir. 2014) ("A municipality may not be held liable under § 1983 on a *respondeat superior* theory—in other words, *solely* because it employs a tortfeasor.") (quotation omitted) (emphasis in original).  Rather, § 1983 liability only attaches to a municipality where its policies or customs caused a violation of a plaintiff's rights.  *See Wright v. City of Euclid*, 962 F.3d 852, 879-80 (6th Cir. 2020); *Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 271 (6th Cir. 2015) (en banc) (Gibbons, J., dissenting) ("As *Monell* has informed us, a municipality is only liable for constitutional violations resulting from official policies or customs.").  To the extent that Rettig raises such a claim against Newport pursuant to the Supreme Court's decision in *Monell v. Dep't. of Soc. Servs.*, this Court will address it separately.  436 U.S. 658 (1978).

prosecution, unlawful seizure, and excessive force – turns on a single dispositive question: whether Officer Lalumandier had probable cause to arrest him.") (citation omitted).  And because Lalumandier had probable cause to arrest Rettig and issue a citation for alcohol intoxication, Lalumandier argues that he is entitled to summary judgment on these claims.  (*Id.*).

### 1.    *False Arrest and Unlawful Seizure*

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures."  U.S. Const. amend. IV.  To succeed on a claim of false arrest or unlawful seizure in violation of the Fourth Amendment, a plaintiff must prove that the police lacked probable cause to detain him. *Davis v. Butler Cnty.*, 658 F.App'x 208, 214 (6th Cir. 2016) (quoting *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2006)).  "Probable cause exists when 'the facts and circumstances within the [officer's] knowledge' are 'sufficient to warrant a person of reasonable caution to believe that an offense had been, was being, or was about to be committed.'"  *Scheffler v. Lee*, 752 F.App'x 239, 244 (6th Cir. 2018) (quoting *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007)).  And, for a false arrest claim, the "offense establishing probable cause need not be 'closely related to, and based on the same conduct as, the offense identified by the arresting officer at the time of arrest.'"  *Hartman v. Thompson*, 931 F.3d 471, 481 (6th Cir. 2019) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)). "[W]hether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law.  Put differently, state law defines the offense for which an officer may arrest a person, while federal law dictates whether probable cause existed for an arrest."  *Kennedy v. City of Villa Hills*, 635 F.3d 210, 215 (6th Cir. 2011) (citation

9

and internal quotation marks omitted).  This is an objective inquiry, which sanctions consideration of only "the facts known to the arresting officer at the time of the arrest." *Devenpeck*, 543 U.S. at 152.  An officer's subjective motivation will not invalidate an otherwise lawful arrest based on probable cause.  *See Hartman*, 931 F.3d at 482 (citing *Arkansas v. Sullivan*, 532 U.S.769, 771-72 (2001)).

Where, as here, a defendant raises qualified immunity as a defense, the defendant "'is entitled to qualified immunity if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the arresting agent.'"  *Scheffler*, 752 F.App'x at 244 (quoting *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008)).  Therefore, Lalumandier is entitled to qualified immunity unless "no reasonably competent officer would have found probable cause" to arrest Rettig based on the facts in Lalumandier's possession at the time of the arrest.  *Id.* (citing *Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007)).

Lalumandier argues that Rettig's claims for false arrest and unlawful seizure must fail because Lalumandier had probable cause to arrest Rettig.  (Doc. # 21 at 9). Specifically, Lalumandier asserts that, at the time of Rettig's arrest, he had probable cause to arrest Rettig for alcohol intoxication under KRS 222.202(1) and disorderly conduct in violation of KRS 525.060.  (*Id.* at 10).  Alternatively, Lalumandier argues that he is entitled to qualified immunity because "no clearly established law would have put a reasonable officer on notice that arresting an intoxicated individual who was loudly disrupting a police scene and annoying nearby residents violated the First or Fourth Amendment."  (*Id.* at 11).

10

### a.      Alcohol Intoxication in Violation of KRS 222.202(1)

Under Kentucky law, a person is guilty of alcohol intoxication when "he appears in a public place manifestly under the influence of alcohol to the degree that he may endanger himself or other persons or property, or unreasonably annoy persons in his vicinity."  KRS 222.202(1).  Sensibly, guilt under this statute requires "much more than simply 'being' drunk."  *Maloney v. Commonwealth*, 489 S.W.3d 235, 239 (Ky. 2016).  Rather, an individual only violates KRS 222.202(1) if he exhibits indicia of alcohol intoxication to such a degree that he may endanger person or property or cause unreasonable annoyance to those in the vicinity.  *Id.*  This requires both alcohol intoxication and "some aberrant behavior on the part of the accused before an arrest is authorized."  *Id.*

Lalumandier asserts that he had probable cause to arrest Rettig for alcohol intoxication.  (Doc. # 21 at 11).  On Lalumandier's telling, undisputed facts reflect that he encountered Rettig in a public place, where Rettig's conduct was unreasonably annoying the victim to whose aid the police had come.  (*Id.*).  Lalumandier also asserts that Rettig's conduct created a significant risk of unreasonably annoying bystanders and other residents of the Academy.  (*Id.*).  Further, Lalumandier points to evidence that Rettig exhibited "clear signs of alcohol intoxication," which provided "ample evidence" of his inebriation.  (*Id.*).

Rettig takes issue with this conclusion.   He argues that Lalumandier lacked probable cause to arrest him for alcohol intoxication for three reasons.   First, Rettig asserts that the hallway in which he was arrested is not a "public place" as required by the statute.  (Doc. # 30 at 14).  Second, Rettig argues that a reasonable jury could

11

conclude that Rettig posed no danger to himself, others, or property "at the moment of arrest." (*Id.* at 15). Finally, Rettig states that a reasonable jury "could find no unreasonable annoyance at the moment of arrest." (*Id.* at 17).

### i.    *Public Place*

For purposes of KRS 222.202(1),

> "Public place" means a place to which the public or a substantial group of persons has access and includes but is not limited to highways, transportation facilities, schools, places of amusements, parks, places of business, playgrounds, *and hallways, lobbies, and other portions of apartment houses and hotels not constituting rooms or apartments designed for actual residence*. An act is deemed to occur in a public place if it produces its offensive or proscribed consequences in a public place.

KRS 525.010(3) (emphasis added); *see also Camarca v. City of Covington*, No. 2:22-cv-128-KKC-CJS, 2025 WL 1143255, at *3 (E.D. Ky. Apr. 16, 2025) (holding that, as a matter of law, hotel lobbies qualify as public places). The statute deems "hallways" of "apartment houses" public places. *Id.* Despite this express inclusion, Rettig points to the fact that entrances to the Academy are locked to the general public. (Doc. # 30 at 14). Indeed, entry to the Academy requires an electronic key fob. (*Id.*). Lalumandier utilized such a device to enter the Academy via a side door and used it again to take the elevator to the third floor. (Doc. # 23 at 14:20-15:35). Rettig acknowledges that the plain text of KRS 525.010 classifies "hallways . . . of apartment houses" as public places. (*Id.*). However, he notes that the statute "first defines a public place as one 'to which the public or a substantial group of persons has access.'" (*Id.* (quoting KRS 525.010)). Because the apartment hallway at issue here required a key fob for entry, Rettig argues that "[a] reasonable jury could find that [the hallway] is not a place to which the public or a substantial group has access." (*Id.*). And because a reasonable jury could so find, Rettig

12

concludes that a factual dispute persists over whether his conduct occurred in a public place. (*Id.*).

Contrary to Rettig's argument, whether the Academy's hallways fall within the definition laid out in KRS 525.010(3) presents a fundamentally legal question. *See Ballinger v. Commonwealth*, 459 S.W.3d 349, 354 (Ky. 2015) ("The proper interpretation of Kentucky statutes is an issue of law[.]") (citation omitted). The parties do not dispute that the hallway in which Lalumandier arrested Rettig is the hallway of an apartment house. Instead, Rettig argues that because the hallway was not open to the general public, it cannot qualify as a public place, regardless of the statutory definition. (Doc. # 30 at 14). In making this argument, however, Rettig asks the Court to ignore the plain text of KRS 525.010(3), which states that apartment hallways are public places. To be sure, the statute defines a public place as one "to which the public or a substantial group of persons has access." KRS 525.010(3). But the statute continues by clarifying that hallways of apartment houses fall within this definition. *Id.* Because Rettig does not dispute that the hallway at issue here was the "hallway[] . . . of [an] apartment house[]," and because such hallways are expressly included within the definition of a public place, the Court rejects Rettig's argument.

Still, even if the hallway in which Rettig was arrested did not qualify as a public place, his conduct on the balcony certainly occurred in a public place. In Kentucky, an individual commits a crime "when he *appears* in a public place manifestly under the influence of alcohol" to the degree that he may endanger person or property or cause unreasonable annoyance. KRS 222.202(1) (emphasis added). Relatedly, under KRS 525.010(3), "[a]n act is deemed to occur in a public place if it produces its offensive or

13

proscribed consequences in a public place." In *United States v. Edmundson*, an officer had probable cause to arrest an apartment resident for disorderly conduct under Kentucky law when he heard the resident screaming out the window of his unit. 405 F.App'x 964, 966 (6th Cir. 2010). Although disorderly conduct, like alcohol intoxication, requires that the offending conduct occur in a public place, the Sixth Circuit determined that because the officer was standing in the parking lot of the apartment building when he heard the shouts, the shouts "produced their offensive consequences in a public place, [and] the officer had probable cause to arrest [the resident] for disorderly conduct." *Id.*

By standing on a private balcony and shouting drunken obscenities into an adjoining parking lot, Rettig caused unreasonable annoyance in a public place.[4] (Doc. # 21 at 11). Thus, Rettig "appeared"—for purposes of KRS 222.202(1)—in a public place. (*Id.*). Accepting for the moment that Rettig's conduct on the balcony caused unreasonable annoyance or created a risk of danger to persons or property, these offensive consequences occurred in a public parking lot. Therefore, under KRS 525.010(3)'s definition of "public place," Rettig's conduct also occurred in a public place. *See also Woosley v. City of Paris*, 591 F. Supp. 2d 913, 920 (E.D. Ky. 2008) ("[W]here a dispute on an otherwise private front lawn creates a risk of public alarm or produces its offensive or proscribed consequences in a public place, the offense of disorderly conduct may lie.").

### ii.   Unreasonable Annoyance

Undisputed evidence shows that Rettig exhibited signs of alcohol intoxication. Lalumandier testified that Rettig's glassy eyes, slurred speech, and strong odor of alcohol

---

4       Rettig does not address this argument in his Response (Doc. # 30).

led him to conclude that Rettig was under the influence of alcohol. (Doc. # 25 at 31:11-16). Indeed, body-worn camera footage shows that Rettig was slurring his words. (*See* Doc. # 23 at 20:40-21:15). In his deposition, Rettig admitted that he had been drinking that evening. (Doc. # 24 at 103:23-104:1). Rettig's Response does not challenge the reasonableness of Lalumandier's determination that he was under the influence of alcohol. Instead, he argues that the relevant inquiry—for purposes of KRS 222.202(1)—concerns whether Lalumandier could reasonably conclude that Rettig's behavior was "'likely to produce' endangerment or unreasonable annoyance." (Doc. # 30 at 14 (quoting *Maloney*, 489 S.W.3d at 244-46)).[5]

Rettig is correct that an individual is only guilty of alcohol intoxication where he exhibits "aberrant behavior . . . that could be reasonably construed as creating a risk that he may endanger himself or other persons or property, or unreasonably annoy persons in his vicinity." *Maloney*, 489 S.W.3d at 240 (quotation omitted); *see also Wilson v. Commonwealth*, No. 2017-CA-001838-MR, 2020 WL 1074836, at *3 (Ky. Ct. App. Mar. 6, 2020). By extension, then, Lalumandier only had probable cause to arrest Rettig for alcohol intoxication if he observed Rettig engage in such behavior.

Here, Rettig engaged in aberrant behavior that created a significant risk of unreasonable annoyance when he shouted obscenities from his balcony late at night. Guilt under KRS 222.202(1) "does not require conduct creating an immediate or actual endangerment or unreasonable annoyance." *Id.* at 239. However, an arrest for alcohol intoxication may not rest on far-fetched speculations that an individual might engage in such conduct in the future. *Id.* Instead, the arresting officer must observe "some manifest

---

[5] Rettig's citation appears to be inaccurate, as the identified pages of the South Western Reporter do not include *Maloney v. Commonwealth*, which ends on page 242.

behavior that is likely to produce the requisite endangerment or annoyance." *Id.* (holding that an individual was not likely to cause endangerment or annoyance when he was passed out on his front porch). Here, Lalumandier observed Rettig engage in behavior that actually caused unreasonable annoyance.

Rettig seems to suggest that his behavior in the hallway immediately prior to his arrest supplies the only relevant conduct for the Court's consideration. (Doc. # 30 at 17-18). Not so. As the Kentucky Supreme Court noted in *Maloney*, a probable cause determination stems from conduct personally observed by the arresting officer. 489 S.W.3d at 239. In the present case, this includes both Rettig's shouting on his balcony as well as his encounter with Lalumandier and the other officers in the hallway. Prior to entering the Academy, Lalumandier observed Rettig hurling obscene insults at an active police scene. These insults eventually provoked a reaction from the female victim the police were attempting to aid. She responded by unleashing her own barrage of profanities until Lalumandier ordered her to stop "egging it on." (Doc. # 23 at 13:22-13:30). Rettig's conduct needlessly exacerbated an already chaotic situation. Based on the evidence before the Court, no reasonable jury could find that Lalumandier acted unreasonably in concluding that Rettig's conduct caused unreasonable annoyance to the victim and was likely to cause further unreasonable annoyance to pedestrians and other residents of the Academy in his vicinity.

Rettig argues that his conduct did not cause unreasonable annoyance and was unlikely to cause such annoyance. First, he observes that although "[m]ultiple members of the public remained in the parking lot" during the episode, "[n]o crowd gathered. No one fled. No bystander requested police intervention because of Plaintiff." (Doc. # 30 at

18).  As a result, he claims that the record does not establish "unreasonable annoyance." (*Id.*).  However, as discussed above, if Lalumandier could reasonably conclude that Rettig's conduct was *likely* to cause unreasonable annoyance, there was probable cause to arrest him.  *See Maloney*, 489 S.W.3d at 239.

Here, it was reasonable for Lalumandier to conclude that Rettig's conduct was likely to annoy pedestrians in the vicinity.  In the body-worn camera footage, bystanders can be seen peering up at Rettig's balcony to observe the scene.  (Doc. # 23 at 12:30-12:50).  Additionally, it was reasonable for Lalumandier to believe that Rettig's commotion was likely to annoy other residents of the Academy, who, at roughly 12:15 a.m., may have been trying to sleep.  Indeed, on the body-worn camera footage, multiple individuals can be seen coming out onto the balcony directly below Rettig's minutes after he began yelling.  (*Id.* at 9:20-9:40).  This potential annoyance comes on top of the fact that Rettig's conduct actually annoyed the female victim who was receiving aid from police and first responders.  And this annoyance was certainly unreasonable.  Rettig inserted himself into a chaotic situation for no apparent reason and refused to cease his behavior after repeated warnings from police officers.

### iii.    *Protected Speech*

Next, Rettig argues that his shouts were directed at the police and, accordingly, they constitute "protected criticism" that cannot be "converted into statutory 'annoyance.'" (Doc. # 30 at 18).  He claims that "profane or offensive speech toward officers, without more, does not supply probable cause for disorderly type offenses."  (*Id.* at 18-19 (citing *Leonard*, 477 F.3d at 358-60; *Wood v. Eubanks*, 25 F.4th 414, 424-26 (6th Cir. 2022)).  Moreover, Rettig contends that "'annoyance' is inherently subjective and cannot serve as

a free-floating criminal standard." (Doc. # 30 at 19 (citing *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971))).  And, he continues, under Kentucky law, probable cause does not arise from conduct which "annoys only the police."  (*Id.* (citing *Pulley v. Commonwealth*, 481 S.W.3d 520-24 (Ky. Ct. App. 2016); *Kennedy*, 635 F.3d at 215-16)).

Without question, "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers."  *City of Houston v. Hill*, 482 U.S. 451, 461 (1987).  This means that "'protected speech cannot serve as the basis' for probable cause."  *Novak v. City of Parma*, 33 F.4th 296, 304 (6th Cir. 2022) (quoting *Leonard*, 477 F.3d at 358).  But this protection does not provide carte blanche to engage in otherwise proscribed behavior.  *See, e.g.*, *Nieves v. Bartlett*, 587 U.S. 391, 401 (2019) (holding that "the content and manner of a suspect's speech may convey vital information" in the probable cause analysis).  Rather, the First Amendment only bars the use of protected speech "as the *sole basis* for probable cause."  *Novak*, 33 F.4th at 304 (citing *Reichle v. Howards*, 566 U.S. 658, 668 (2012)) (emphasis added); *see also Nieves*, 587 U.S. at 389-90.

Although Rettig had every right to criticize police officers, he had no right to unreasonably annoy others in the process.  *See Hagedorn v. Cattani*, 715 F.App'x 499, 506 (6th Cir. 2017) (finding that a plaintiff "did not have an unfettered right to disturb Timberlake residents while engaging in protected speech"); *Ward v. Rock Against Racism*, 491 U.S. 781, 796 (1989) ("[G]overnment has a substantial interest in protecting its citizens from unwelcome noise.") (internal quotation omitted) (cleaned up).  This reflects a bedrock principle of our First Amendment law—that protected speech may be

18

"subject to reasonable time, place, and manner restrictions."  *Heffron v. Int. Soc. For Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981) (citations omitted).

Here, Rettig's conduct went beyond merely criticizing the police.  To start, not all of Rettig's invective was directed at Lalumandier or the other officers gathered at the scene.  A significant portion of Rettig's tirade targeted only the victim.  (*See* Doc. # 23 at 12:40-13:20).   Additionally, the time and manner of Rettig's speech are vital considerations.   Unlike the plaintiff in *Leonard*, Rettig was not arrested for "merely advocating an idea" at a reasonable volume during a public town meeting.[6]  *Leonard*, 477 F.3d at 361.  Instead, Rettig needlessly inserted himself into an active police scene by drunkenly shouting from the balcony of his girlfriend's apartment at midnight.  This *conduct*—independent of the content of Rettig's shouts—provided Lalumandier with probable cause to arrest him for alcohol intoxication under Kentucky law.

The Sixth Circuit has repeatedly affirmed that such conduct, even if incident to protected speech, can supply probable cause for an arrest.  *See, e.g.*, *Hagedorn*, 715 F.App'x at 506 (probable cause to arrest a woman whose tirade was "inappropriately loud"

---

[6]    Rettig also cites *Wood v. Eubanks* for the proposition that offensive speech directed at police officers cannot supply probable cause for "disorderly-type offenses."  (Doc. # 30 at 19).  In *Wood*, the Sixth Circuit noted that Ohio's disorderly conduct statute requires that a person may not be arrested for disorderly conduct on the basis of their speech "unless the words spoken are likely, by their very utterance, to inflict injury or provoke the average person to an immediate retaliatory breach of the peace."  25 F.4th at 422 (quoting *State v. Hoffman*, 57 Ohio St.2d 129, 387 N.E.2d 239, 242 (1979)).  Thus, under Ohio law, mere speech will only constitute disorderly conduct if it rises to the level of "fighting words."  *Id.* (citations omitted).  Because the *Wood* plaintiff's speech did not clear this high bar, the Sixth Circuit determined that the arresting officers lacked probable cause.  *Id.* at 425.  However, the Sixth Circuit took pains to reaffirm that "behavior involving more than mere epithets provides probable cause for a disorderly conduct arrest."  *Id.* at 424.  The *Wood* Court specifically noted that an "inappropriately loud" tirade can supply probable cause.  *Id.* (citing *Hagedorn*, 715 F.App'x 499, 506 (6th Cir. 2017)).  While Rettig may be correct that "profane or offensive speech toward officers, without more, does not supply probable cause for disorderly-type offenses," his conduct in this instance went beyond merely profane speech or criticism of police.  (Doc. # 30 at 18-19).

and disturbed neighbors); *King v. Ambs*, 519 F.3d 607, 614 (6th Cir. 2008) (holding that an officer has probable cause to arrest for disorderly conduct "an individual whose act of speaking, by virtue of its time and manner, plainly obstructed ongoing police activity involving a third party"); *see also Lulgjuraj v. Huron-Clinton Metro. Auth.*, No. 2:23-cv-12931, 2026 WL 432702, at *15 (E.D. Mich. Feb. 16, 2026) (holding that plaintiff's protected speech was subsumed under the unprotected activity of disorderly conduct) (citing *Wood*, 25 F.4th at 423-24).  Thus, the Court rejects Rettig's argument that his conduct could not supply probable cause for his arrest because it was merely "profane or offensive speech" which annoyed only the police.  (Doc. # 30 at 18-19).

Rettig also directs the Court to *Scheffler v. Lee*, where the Sixth Circuit held that factual issues precluded summary judgment in a case involving an allegedly false arrest for violation of KRS 222.202(1).  752 F.App'x at 247-48.  In *Scheffler*, an individual was arrested in the lobby of a hotel and charged with alcohol intoxication and disorderly conduct in violation of Kentucky law. *Id.* at 242.  However, the plaintiff in *Scheffler* denied that he had consumed any alcohol at all. *Id.* at 245.  Video and audio evidence showed that he was steady on his feet and that he did not slur his speech. *Id.* at 246.  Second, the *Scheffler* plaintiff denied yelling or swearing at officers or other patrons of the hotel where he was arrested. *Id.* at 245.  Again, video evidence supported this version of events. *Id.*  Finally, the plaintiff maintained that, because he was behaving in an orderly fashion, he was not annoying any passersby or other hotel patrons. *Id.*  Security footage from the hotel did not indicate that any bystanders even noticed the *Scheffler* plaintiff during the ordeal. *Id.* at 246.

Here, by contrast, Rettig admits that he had been drinking on the night in question. (Doc. # 24 at 38:10-39:7).  And Rettig does not dispute Lalumandier's testimony that Rettig had glassy eyes, slurred his speech, and smelled of alcohol.  (Doc. # 25 at 31:11-16).  Thus, unlike in *Scheffler*, there is no genuine dispute that Rettig was manifestly under the influence of alcohol.  Second, Rettig does not contest that he was shouting from the balcony and behaving in a generally boisterous manner.  Indeed, he acknowledges that he was yelling down from the balcony at the victim who Lalumandier and other Newport first responders were aiding.  (Doc. # 24 at 47:15-19).  Unlike in *Scheffler*, bystanders certainly noticed this behavior.  The victim at whom Rettig was shouting insults was provoked to respond in kind until the police ordered her to stop. Additionally, video evidence shows that occupants of the apartment directly below Rettig emerge onto the balcony shortly after Rettig's outburst began.  (*See* Doc. # 23 at 9:00-9:30).

Based on these facts, a reasonable person in Lalumandier's position could conclude that Rettig had violated KRS 222.202(1).  Therefore, Lalumandier had probable cause to arrest Rettig for alcohol intoxication.  *See Crockett v. Cumberland Coll.*, 316 F.3d 571, 580 (6th Cir. 2003) (holding that probable cause exists when the "facts and circumstances within an officer's knowledge [] are sufficient to warrant a prudent person of reasonable caution, in believing . . . that the suspect had committed, is committing or is about to commit an offense") (citing *Michigan v. DiFillippo*, 443 U.S. 31, 37 (1979)).

### b.    Disorderly Conduct in violation of KRS 525.060

Lalumandier also argues that he had probable cause to arrest Rettig for disorderly conduct under KRS 525.060.  (Doc. # 21 at 10).

Under Kentucky law, a person is guilty of disorderly conduct when:

[I]n a public place and with intent to cause public inconvenience, annoyance, or alarm, or wantonly creating a risk thereof, he: (a) Engages in fighting or in violent, tumultuous, or threatening behavior; (b) Makes unreasonable noise; (c) Refuses to obey an official order to disperse issued to maintain public safety in dangerous proximity to a fire, hazard, or other emergency; or (d) Creates a hazardous or physically offensive condition by any act that serves no legitimate purpose.

KRS 525.060(1).  However, "Kentucky law does not criminalize arguments and noise that disturb only police officers because such conduct does not risk *public* alarm."  *Kennedy*, 635 F.3d at 215-16.  Public alarm entails conduct "which affects or is likely to affect a substantial group of persons."  KRS 525.060 cmt.  Conduct taking place in "privately owned facilities such as stores, apartment houses and theatres" can cause public inconvenience, annoyance, or alarm under the statute.  *Id.*; *see also Edmundson*, 405 F.App'x at 965-66 (holding that officers had probable cause to arrest an individual for disorderly conduct even though he was shouting from inside a private apartment).  However, "a person may not be arrested for disorderly conduct as a result of activity which annoys only the police."  *Id.*; *see also Johnson v. Smith*, No. 5:21-cv-00187, 2024 WL 1329925, at *8 (W.D. Ky. Mar. 27, 2024).  Whether noise is "unreasonable" depends "upon the time, place, nature and purpose of the noise."  *Id.*

Lalumandier argues that he had probable cause to arrest Rettig for disorderly conduct because he made unreasonable noise that wantonly created a risk of public inconvenience, annoyance, or alarm.  (Doc. # 21 at 11).  Rettig counters by arguing that "[v]erbal criticism from a balcony, without threats or incitement, is not fighting, threatening behavior, unreasonable noise of the statutory type, or creation of a hazardous condition."

22

(Doc. # 30 at 21).  He argues that because his shouts from the balcony were directed at police they could not create probable cause under KRS 525.060.  (*Id.*).

In support of his argument, Rettig cites *Kennedy v. City of Villa Hills*, 635 F.3d 210 (6th Cir. 2011).  In that case, the Sixth Circuit held that a police officer lacked probable cause to arrest the plaintiff for disorderly conduct under KRS 525.060 after he shouted profane insults at the police officer during an argument that took place in a city building. *Id.* at 212.  The Sixth Circuit reached this conclusion because factual disputes existed as to whether the plaintiff even raised his voice or yelled at the officer at all.  *Id.* at 215.  Even if the plaintiff had shouted at the officer, however, the *Kennedy* court determined that probable cause did not exist because the argument occurred in a city building that was not open to the public and the only people who could have heard the tumult were the arresting officer and a few other city employees.  *Id.* at 216.  Thus, there was little risk of public alarm because "no members of the public were present in the city building."  *Id.* (cleaned up).

However, unlike the *Kennedy* plaintiff, Rettig's shouts were not aimed strictly at a police officer.  Indeed, he repeatedly taunted the victim and urged her to "have fun in jail." (Doc. # 23 at 12:40-12:50).  And Rettig's conduct posed a much greater risk of public alarm, annoyance, or inconvenience.  Determining whether Rettig caused "unreasonable noise" requires consideration of the "time, place, nature and purpose of the noise."  KRS 525.060 cmt.  Here, the parties do not dispute that Rettig was yelling from the balcony of his girlfriend's apartment at roughly 12:15 a.m.  This conduct differs markedly from that involved in *Kennedy*, where no members of the public could have heard the argument. 635 F.3d at 216.  Multiple members of the public, including the female victim, other

23

apartment residents, and passersby, could have heard Rettig's shouting, which was unreasonable under the circumstances.  Consequently, Lalumandier could reasonably conclude that Rettig had made unreasonable noise that wantonly created a risk of public inconvenience or annoyance.  So, Lalumandier had probable cause to arrest Rettig for disorderly conduct.  *See Collins v. Commonwealth*, No. 2002-CA-001991-MR, 2004 WL 315035, at *1 (Ky. Ct. App. Feb. 20, 2004) (holding that a defendant caused unreasonable noise under KRS 525.060(1)(b) and wantonly created a risk of public annoyance or inconvenience by continuing to shout at his girlfriend at 3:00 a.m. in a residential trailer park, despite officers' repeated warnings).

Because, viewing the undisputed facts in the light most favorable to Rettig, Lalumandier had probable cause to arrest Rettig for alcohol intoxication and disorderly conduct, he did not violate Rettig's Fourth Amendment rights by placing him under arrest. Therefore, it is unnecessary to proceed past the first step of the qualified immunity analysis.  *See Sumpter v. Wayne Cnty.*, 868 F.3d 473, 480 (6th Cir. 2017) (noting that a plaintiff must satisfy both steps of the qualified immunity inquiry to defeat the defense) (citation omitted).

For all of these reasons, Lalumandier is entitled to qualified immunity on Rettig's claims for false arrest and unlawful seizure.

### 2.    *Malicious Prosecution*

Aside from his claims of false arrest and unlawful seizure, Rettig asserts that Lalumandier violated his Fourth Amendment rights by initiating a malicious prosecution. (Doc. # 1 ¶¶ 78).  Lalumandier argues that he is entitled to qualified immunity because

24

he had probable cause to arrest Rettig for alcohol intoxication, which precludes a claim for malicious prosecution.  (Doc. # 21 at 9).

"To demonstrate malicious prosecution, a plaintiff must show that: '(1) the defendant made, influenced, or participated in the decision to prosecute the plaintiff; (2) there was no probable cause for the prosecution; (3) as a consequence of the legal proceedings, the plaintiff suffered a deprivation of liberty apart from the initial arrest; and (4) the criminal proceeding was resolved in the plaintiff's favor.'"  *Clark v. Abdallah*, 131 F.4th 432, 453 (6th Cir. 2025) (quoting *Tanner v. Walters*, 98 F.4th 726, 734 (6th Cir. 2024)).   Here, Lalumandier challenges only the second element—the existence of probable cause.  (Doc. # 21 at 9).

As discussed in Section III.B.1.a, viewing all the undisputed facts in the light most favorable to Rettig, a reasonable person in Lalumandier's position would believe that Rettig had violated KRS 222.202.   Rettig argues that "no reasonable officer could conclude Rettig endangered anyone or unreasonably annoyed bystanders.   Odor of alcohol plus speech and officer irritation, without any annoyed third party, do not meet KRS 222.202's elements."  (Doc. # 30 at 24).

However, undisputed facts belie this portrayal.  First, Lalumandier's determination that Rettig was manifestly under the influence of alcohol did not stem solely from the fact that Rettig smelled of alcohol.  Rather, Lalumandier heard Rettig slurring his words and observed that Rettig had glassy eyes in addition to smelling alcohol.  (Doc. # 25 at 31:11-16).  Rettig admits that he was, in fact, under the influence of alcohol at the time.  (Doc. # 24 at 12-18).  Second, guilt under KRS 222.202(1) does not require that the offender's conduct *actually* annoyed a third party.  *Maloney*, 489 S.W.3d at 239 (holding that "guilt

25

under the statute does not require conduct creating an immediate or actual endangerment or unreasonable annoyance"). Rather, Lalumandier had probable cause to arrest Rettig upon the reasonable belief that Rettig's behavior was likely to produce unreasonable annoyance. *Id.* Rettig's shouts clearly annoyed the female victim, who responded with profane taunts of her own. And this annoyance was unreasonable, as Rettig needlessly inserted himself in the situation without provocation. But even if Rettig's conduct did not cause actual annoyance to the victim—which it did—Lalumandier could reasonably have concluded that shouting from the balcony at 12:15 a.m. was likely to annoy other residents of the Academy. *See Collins*, 2004 WL 315035, at *1.

Viewing the undisputed facts in the light most favorable to Rettig, a reasonable person in Lalumandier's position would have had probable cause to arrest and charge Rettig with alcohol intoxication. Therefore, Rettig did not suffer a constitutional violation. As with Rettig's claims for false arrest and unlawful seizure, Lalumandier is entitled to qualified immunity on Rettig's malicious prosecution claim.

### 3.    *Excessive Force*

Rettig also alleges that Lalumandier violated his Fourth Amendment rights by using excessive force during his arrest. (Doc. # 1 ¶ 80). Specifically, Rettig claims that Lalumandier "used excessive force because [he] handcuffed and restrained Rettig for refusing to provide information that Defendants were never actually entitled to." (*Id.*). Lalumandier argues that Rettig's excessive force claim is premised on the fact that Rettig's arrest was unlawful and, as a result, any associated restraint constituted excessive force. (Doc. # 21 at 9). Rettig does not mention his excessive force claim in his Response, let alone address Lalumandier's arguments. Thus, under Sixth Circuit

26

precedent, Rettig has abandoned his excessive force claim. *Brown v. VHS of Michigan, Inc.*, 545 F.App'x 368, 372 (6th Cir. 2013) ("A plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment."); *Webb v. Whitley County*, No. 6:23-cv-188-KKC, 2026 WL 1082977, at *25 (E.D. Ky. Apr. 21, 2026) ("A plaintiff who fails to address a claim in response to a motion for summary judgment abandons the claim."). Because Rettig failed to address his excessive force claim in response to Lalumandier's Motion for Summary Judgment (Doc. # 21), that claim is **dismissed**.

### C.    Unlawful Entry

Although Rettig does not explicitly identify a § 1983 claim for unlawful entry in violation of the Fourth Amendment in his Complaint, he makes allegations that seem to implicate such a claim. (*See* Doc. # 1 ¶¶ 45-51). Lalumandier addresses this claim in his Motion for Summary Judgment, and the Parties have fully briefed the issue. (Doc. # 21 at 15-16). Accordingly, the Court will consider Lalumandier's argument that he is entitled to summary judgment to the extent that Rettig pleads an unlawful entry claim. *See Cummings v. City of Akron*, 418 F.3d 676, 681 (6th Cir. 2005).

"It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Baker v. City of Trenton*, 936 F.3d 523, 530 (6th Cir. 2019), *cert. denied sub nom. Baker v. City of Trenton, Michigan*, 589 U.S. 1203 (2020). The Supreme Court has remarked that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585-86 (1980) (quoting *United States v. U.S. Dist. Ct.*, 407 U.S. 297, 313 (1972)). Still, "the Fourth Amendment does not prohibit all unwelcome

27

intrusions 'on private property,'—only 'unreasonable' ones." *Caniglia v. Strom*, 593 U.S. 194, 198 (2021) (quoting *Florida v. Jardines*, 569 U.S. 1, 6 (2013)).

Lalumandier first argues that Rettig has failed to *plead* an unlawful entry claim because he "does not allege facts sufficient to establish a reasonable expectation of privacy in the common hallway of a large, multi-unit apartment building." (Doc. # 21 at 31). And, Lalumandier continues, without allegations "that the hallway was private, restricted, or otherwise excluded from general access," Rettig cannot establish a sufficient expectation of privacy in the common areas of the Academy. (*Id.*).

To start, a motion for summary judgment under Federal Rule of Civil Procedure 56 is not the appropriate vehicle to challenge the sufficiency of the pleadings. The Sixth Circuit has made clear that "challenges to the sufficiency of the pleadings must be asserted in a motion to dismiss under Rule 12(b)(6) rather than on a motion for summary judgment." *McCarthy v. Ameritech Pub., Inc.*, 763 F.3d 469, 478 n. 2 (6th Cir. 2014); *see also Spadafore v. Gardner*, 330 F.3d 849, 852-53 (6th Cir. 2003) (holding that, when evaluating a motion for summary judgment in a § 1983 action "[t]he question of whether the pleadings were fatally insufficient is [] no longer the correct inquiry"). This Court and others throughout the Sixth Circuit have declined to grant summary judgment on this basis. *See, e.g., Cornelius v. City of Mount Washington*, No. 3:18-cv-00341-GNS-CHL, 2021 WL 3082246, at *8 n. 10 (W.D. Ky. July 21, 2021) (holding that the defendants' argument that the plaintiff failed to state a claim was "irrelevant" at the summary judgment stage); *Hall v. Rag-O-Rama*, No. 18-cv-12-DLB-CJS, 2020 WL 2134121, at *16 n. 22 (E.D. Ky. May 5, 2020) ("The Sixth Circuit has made clear, however, that failure to follow pleading requirements is not grounds for dismissal at the summary-judgment stage.")

(citation omitted); *Bryant v. City of Berea*, No. 1:23-cv-2032, 2025 WL 1746018, at *14 (N.D. Ohio June 24, 2025).  So, to the extent Lalumandier seeks summary judgment because of Rettig's failure "to plead an unlawful entry claim," his Motion for Summary Judgment fails.[7]

As an alternative to his failure-to-plead theory, Lalumandier also argues that even if Rettig had a privacy interest in the hallways and common areas of the Academy, summary judgment is appropriate because undisputed facts show that Lalumandier had consent to enter the building under these circumstances.  (Doc. # 21 at 15).  Specifically, Lalumandier points to his own testimony and an affidavit from Melissa McIntyre as evidence of his consent to enter the Academy.[8]  (Doc. # 35 at 10).  Rettig, on the other

---

[7]    Even if Lalumandier had properly challenged the sufficiency of Rettig's Complaint in a motion pursuant to Rule 12, Rettig alleged facts sufficient to establish a reasonable expectation of privacy in the Academy's hallways and common areas.  In *United States v. Carriger*, the Sixth Circuit held that "a tenant in [a locked] apartment building has a reasonable expectation of privacy in the common areas of the building not open to the general public."  541 F.2d 545, 549 (1976); *see also United States v. Heath*, 259 F.3d 522, 534 (6th Cir. 2001) ("[T]he most casual reading of *Carriger* reveals that *any* entry into a locked apartment building without permission, exigency or a warrant is prohibited.") (emphasis in original); *see also Hicks v. Scott*, 958 F.3d 421, 432 (6th Cir. 2020).  And the Complaint clearly alleges that the Academy's common areas were not open to the public.  For example, Rettig notes that Lalumandier had to use a key fob to enter the Academy and, once inside, to use the elevator.  (Doc. # 1 ¶ 47).  Rettig alleges unambiguously that "the hallway is, in fact, private property, accessible only to residents and authorized persons." (*Id.* ¶ 48).  Finally, Rettig specifically disagrees with the citation's assertion that the hallway where Rettig was arrested was "open to the public."  (*Id.* ¶ 45).  These allegations are comfortably sufficient to plead a privacy interest in the hallways and common areas of the Academy.

[8]    McIntyre's affidavit (Doc. # 35-1) was not submitted with Lalumandier's original Motion for Summary Judgment but, rather, attached to his Reply.  The Sixth Circuit "has explicitly approved of such filings, provided that two conditions are satisfied: (1) the affidavit responds only to the nonmoving party's opposition memorandum, and (2) the nonmoving party has an opportunity to respond."  *Gilleland v. Scanhals*, 55 F. App'x 257, 261 (6th Cir. 2003) (citing *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 476 (6th Cir. 2002)).  Here, McIntyre's affidavit responds directly to arguments Rettig made in his Response (Doc. # 30).  Rettig argues that McIntyre did not give ongoing consent to Lalumandier for such entries.  (*Id.* at 34).  Rettig also argues that Lalumandier's entry under these circumstances may have exceeded the scope of any consent that McIntyre had given.  (*Id.*).  McIntyre's affidavit addresses these arguments and clarifies the scope of her consent.  (*See* Doc. # 35-1 ¶¶ 6-8).  Additionally, Rettig had an opportunity to respond to McIntyre's affidavit.  Like the nonmoving party in *Gilleland*, Rettig has not sought leave to

hand, argues that a landlord "cannot give blanket authorization to search or enter on behalf of tenants." (Doc. # 30 at 34). And even if a landlord could give such authorization, Rettig continues, factual disputes cloud the scope of the consent Lalumandier received, precluding summary judgment. (*Id.*).

Although the Fourth Amendment ordinarily prohibits the warrantless entry of a person's house, a carefully drawn exception permits entries upon consent. *Georgia v. Randolph*, 547 U.S. 103, 109 (2006) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990); *Jones v. United States*, 357 U.S. 493, 499 (1958)). However, this consent must be "voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." *United States v. Canipe*, 569 F.3d 597, 602 (6th Cir. 2009) (citing *United States v. Worley*, 193 F.3d 380, 385 (6th Cir. 1999)). The burden of establishing this exception rests with the officer invoking consent. *Andrews v. Hickman Cnty.*, 700 F.3d 845, 854 (6th Cir. 2012) (citations omitted). Valid consent may be given by "a third party who possesse[s] common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171 (1974). Consent is still valid even if given by a third party who, although lacking actual authority to authorize an entry, had the apparent authority to authorize the entry through consent. *United States v. Morgan*, 435 F.3d 660, 663 (6th Cir. 2006) (citations omitted).

Here, the parties agree that Lalumandier did not have a warrant to enter the Academy and neither party contends that exigent circumstances justified his entry. Instead, the legality of Lalumandier's entry hinges on the consent exception to the Fourth

---

respond to the affidavit. 55 F.App'x at 261. Nor has he filed a motion to strike the affidavit pursuant to Rule 12(f) of the Federal Rules of Civil Procedure. *Id.* As a result, the Court will consider McIntyre's affidavit in ruling on Defendants' Motion for Summary Judgment (Doc. # 21).

Amendment's warrant requirement. Ordinarily, a landlord lacks authority to consent to the search of a tenant's private living quarters. *See United States v. Kimber*, 395 F.App'x 237, 244 n. 8 (6th Cir. 2010) (citing *Chapman v. United States*, 365 U.S. 610, 616 (1961)). However, the Sixth Circuit has recognized that "a landlord obviously may enter and control his building's common spaces and may thus consent to a search of such spaces." *Id.* (citations omitted). So, although Rettig maintains a privacy interest in the common areas of the Academy that are not open to the public, the building's owner had authority to consent to Lalumandier's entry into these areas. *See id.* at 245 (owner of a residential apartment building had authority to give continuing consent to police officers' entry of common areas). Although Rettig certainly had the right to exclude the police from his individual apartment unit, he had no right to exclude the police—or other third parties—from the hallways and common areas of the Academy upon the valid consent of the landlord. *See Carriger*, 541 F.2d at 550 ("Had the police been admitted as guests of another tenant or had the approaches been thrown open by an obliging landlady or doorman, they would have been legally in the hallways.").

Lalumandier entered the Academy pursuant to valid consent. At his deposition, Lalumandier testified that he previously lived in the Academy as a tenant. (Doc. # 25 at 16:6-8). During his time as a tenant, he served as a courtesy officer for the building, meaning that he handled security issues on behalf of the Academy's management in exchange for a reduced rate of rent. (*Id.* at 17:25-18:8; Doc. # 35-1 ¶ 4). When he moved out of the building, he received a key fob from Melissa McIntyre, the Academy's Community Manager. (*Id.* at 16:1-5; Doc. # 35-1 ¶¶ 2, 6). As Community Manager, McIntyre was an employee of the Academy, and she "had authority to grant access to the

31

building for security and management purposes and to determine who may be provided with access devices such as key fobs for entry to the building's common areas." (Doc. # 35-1 ¶ 3).   The key fob McIntyre issued Lalumandier was different from the one Lalumandier possessed as a tenant and it only allowed him to enter the building's common areas.  (Doc. # 25 at 17:7-9; Doc. # 35-1 ¶ 6).  In her affidavit, McIntyre states that Lalumandier was provided with access to the Academy's common areas "so he could continue assisting with security issues at the property when necessary."  (Doc. # 35-1 ¶ 6).  McIntyre did not place any restrictions or conditions on Lalumandier's use of the key fob to access the Academy's common areas.  (*Id.* ¶ 8; Doc. # 25 at 52:14-16).  McIntyre confirms that Lalumandier's entry to the Academy was consistent with the permission she had previously granted him to enter the building.  (*Id.* ¶ 11).

Rettig does not contest these facts.  Rather, he argues that no landlord can give this kind of continuing consent to enter an apartment building's common areas.  (Doc. # 30 at 34).  To support this contention, Rettig cites *Chapman v. United States*, 365 U.S. 610 (1961).  However, the facts involved in that case are readily distinguishable.

In *Chapman*, the Supreme Court held that a landlord lacked the ability to consent to police officers' entry of a single-family dwelling to search for contraband.  *Id.* at 618.  Here, Lalumandier only entered common areas of the Academy which, though closed to the general public, were not individual dwellings.  And the Sixth Circuit has recognized that a landlord's consent authorizes police entry of these areas.  *See, e.g. Kimber*, 395 F. App'x at 244 n. 8; *Carriger*, 541 F.2d at 550.  Rettig offers no support for the proposition that a landlord must contemporaneously assent to each and every warrantless entry.  On the contrary, the Sixth Circuit has approved of ongoing consent to enter common areas.

32

*See Id.* at 245 (finding that a previously written letter authorizing warrantless entry by police could provide a "facially satisfactory statement of consent").[9]  And although Rettig argues that a jury could reasonably find that McIntyre did not provide Lalumandier with "ongoing, unlimited consent for warrantless entry to pursue a misdemeanor arrest," undisputed evidence indicates that this is precisely what she did.  (Doc. # 30 at 34).  Lalumandier testified that McIntyre did not place any restrictions on his access to the Academy's common areas.  (Doc. # 25 at 52:14-16).  McIntyre also states that the permission she gave Lalumandier "was not limited to any particular time" but that she "trusted him to use that access when necessary to address safety issues affecting the property or its residents." (Doc. # 35-1 ¶ 8).  And she confirms that Lalumandier's entry was consistent with the scope of her consent.  (*Id.* ¶ 11).  As a result, a reasonable person in Lalumandier's position would have believed that he had consent to enter the Academy under these circumstances.  *Florida v. Jimeno*, 500 U.S. 248, 251 (1991) ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of objective reasonableness[.]").  Thus, Rettig did not suffer a constitutional deprivation when Lalumandier entered the Academy's common areas pursuant to valid consent.

Because undisputed evidence shows that McIntyre, an individual with authority to provide access to the Academy's common areas, consented to Lalumandier's entry under these circumstances, no reasonable jury could find for Rettig on his unlawful entry claim and Lalumandier is entitled to judgment as a matter of law.

---

9       Although the Sixth Circuit found that an owner's letter authorizing warrantless entry was a valid statement of continuing consent, the *Kimber* court held that the letter at issue in that case could not provide consent for the warrantless entry at issue because the letter was written by a previous owner of the apartment building who no longer had authority to provide such consent. *Id.* at 244-45.  Here, Rettig does not contest McIntyre's assertion that she possessed authority to confer consent as an agent of the Academy.  (Doc. # 35-1 ¶¶ 2-3).

### D.    First Amendment Claim

Rettig also alleges that Lalumandier arrested him in retaliation for criticizing the police.    (Doc. # 1 ¶¶ 67-73).    He claims that this speech is protected by the First Amendment.  (*Id.* ¶ 70).  Consequently, Rettig asserts that Lalumandier violated his First Amendment rights by arresting him.  (*Id.* ¶ 73).

#### 1.    *Lalumandier is entitled to summary judgment*

Generally speaking, the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech.  *Nieves*, 587 U.S. at 398.  A claim of First Amendment retaliation under 42 U.S.C. § 1983 requires a plaintiff to prove: (1) that he engaged in speech protected by the First Amendment; (2) that a government official took an adverse action against him; and (3) that a causal connection exists between the speech and that action.  *Lemaster v. Lawrence Cnty.*, 65 F.4th 302, 307 (6th Cir. 2023).  If a plaintiff establishes these three elements, "the burden shifts to the defendant to show he would have taken the same action even if the plaintiff had not engaged in protected conduct."  *Sevy v. Barach*, 815 F. App'x 58, 63 (6th Cir. 2020) (citing *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001)).  Here, Rettig argues that his shouts from the balcony were protected speech and that he suffered an adverse action in the form of his arrest.  (Doc. # 30 at 25-26).  Lalumandier does not challenge these conclusions.  Rather, he claims that Rettig's claims must fail for lack of causation.  (Doc. # 35 at 7).

Lalumandier raises qualified immunity as a defense to Rettig's First Amendment claim.  (Doc. # 21 at 10).  As discussed in relation to Rettig's Fourth Amendment claims, qualified immunity entails a two-step analysis.  First, the Court must determine whether

34

Lalumandier violated Rettig's First Amendment rights.    Second, if such a violation occurred, the Court must determine whether the rights at issue were clearly established at the time of the violation.    *Sevy*, 815 F. App'x at 63-64; *see also Ferreiras v. City of Covington*, No. 2:24-cv-74-SCM-CJS, 2026 WL 473994, at *12 (E.D. Ky. Feb. 19, 2026).

When, as here, the alleged retaliatory act is an arrest, causation is difficult to prove. *Grady v. Cratsenburg*, 170 F.4th 995, 1001 (6th Cir. 2026).    As the Supreme Court observed, this complexity stems from the fact that "protected speech is often a 'wholly legitimate consideration' for officers when deciding to make an arrest."    *Nieves*, 587 U.S. at 401 (quoting *Reichle*, 566 U.S. at 668).    Although an officer might bear some animus toward a suspect because of the content of his speech, "the officer may decide to arrest the suspect because his speech provides evidence of a crime or suggests a potential threat."    *Reichle*, 566 U.S. at 668.    And an officer's retaliatory motive is "easy to allege and hard to disprove."    *Nieves*, 587 U.S. at 403.    Allowing every arrestee to probe an arresting officer's subjective intent would "dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties."    *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d. Cir. 1949) (Learned Hand, C.J.).

To avoid this result, the Supreme Court established an objective threshold requirement for First Amendment retaliation claims.    "The presence of probable cause should generally defeat a First Amendment retaliatory arrest claim."    *Nieves*, 587 U.S. at 405.    "Plaintiffs, therefore must 'plead and prove the absence of probable cause for the arrest' to proceed with suit."    *Grady*, 170 F.4th at 1001 (quoting *Id.* at 407).    This requirement serves a gatekeeping role that reflects the Supreme Court's determination that the absence of probable cause "provide[s] weighty evidence that the officer's animus

35

caused the arrest, whereas the presence of probable cause will suggest the opposite." *Nieves*, 587 U.S. at 402.

Nevertheless, the Supreme Court also recognized that "a narrow qualification is warranted for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Id.* at 406. As Justice Gorsuch noted in his concurrence, "criminal laws have grown so exuberantly and come to cover so much previously innocent conduct that almost anyone can be arrested for something." *Id.* at 412 (Gorsuch, J., concurring in part and dissenting in part). "If the state could use these laws not for their intended purposes but to silence those who voice unpopular ideas, little would be left of our First Amendment liberties[.]" *Id.* Mindful of this danger, the *Nieves* Court held that a plaintiff's First Amendment retaliation claim may proceed— notwithstanding the existence of probable cause—"when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.* at 407 (citation omitted). The *Nieves* court offered jaywalking as an example. *Id.* "[A]t many intersections, jaywalking is endemic but rarely results in arrest." *Id.* Thus, "[i]f an individual who has been vocally complaining about police conduct is arrested for jaywalking at such an intersection, it would seem insufficiently protective of First Amendment rights to dismiss the individual's retaliatory arrest claim" because the officer had probable cause to arrest. *Id.* Nevertheless, the Supreme Court has emphasized that this exception is "slim." *Gonzalez*, 602 U.S. at 658.

A plaintiff must point to "objective evidence" that he was arrested in circumstances where officers *typically* exercise their discretion not to conduct an arrest. *Nieves*, 587

36

U.S. at 407 (emphasis added).  Sufficient evidence can come in the form of historical data demonstrating that "no one ha[d] ever been arrested for engaging" in the conduct at issue. *Gonzalez*, 602 U.S. at 658.  Alternatively, a plaintiff can point to "officers' failure to arrest others who were similarly situated to the plaintiff."  *Grady*, 170 F.4th at 1002 (citing *Nieves*, 587 U.S. at 407).  If a plaintiff produces sufficient evidence, his retaliatory arrest claim "can advance to the traditional burden-shifting framework" and he may demonstrate that his arrest was motivated by his protected speech.  *Id.* at 1001-02 (citing *Nieves*, 587 U.S. at 407).

For reasons already discussed, Lalumandier had probable cause to arrest Rettig for alcohol intoxication and disorderly conduct.  Thus, his retaliatory arrest claim will fail unless he presents objective evidence that otherwise similarly situated individuals are not ordinarily arrested for the same conduct.

Rettig contends that alcohol intoxication under KRS 222.202 is analogous to jaywalking because guilt "depends on subjective assessments of whether a person 'may' endanger or 'unreasonably annoy' others, and officers are not required to arrest in every instance."  (Doc. # 30 at 31).  He cites Officer Reynolds's statement that he "does not always arrest individuals he believes are intoxicated" as proof that officers do not typically arrest for violations of KRS 222.202.  (*Id.*).  Similarly, Rettig cites Lalumandier and Chief Day's testimony that officers have discretion to arrest for violations of KRS 222.202.  (*Id.*).  But these statements say nothing about whether officers "*typically* exercise their discretion" not to arrest.  *Nieves*, 587 U.S. at 406 (emphasis added).  Guilt under KRS 222.202 requires more than mere intoxication.  *Maloney*, 489 S.W.3d at 239.  Thus, the fact that Officer Reynolds does not arrest some individuals he believes to be intoxicated

is irrelevant.  He would not have probable cause to arrest unless he observed aberrant behavior that created a risk of danger or unreasonable annoyance.  *Id.*  Likewise, the mere fact that Newport Police officers have discretion to arrest for alcohol intoxication says nothing about how they *typically* exercise that discretion.

Rettig also argues that the way Lalumandier enforced KRS 222.202 in this case triggers the *Nieves* exception.  He notes that the female victim "also engaged in loud and vulgar insults during [her exchange with Rettig.]"  (Doc. # 30 at 30).  Indeed, the female victim also appeared in a public place—the parking lot adjacent to the Academy.  And, after Rettig started berating her, she returned her own barrage of insults.  She yelled back that Rettig "look[ed] gay," and asked if he was "celebrating pride month" before urging him to "go back inside and take it in the ass."  (Doc. # 29 at 13:15-13:35).  Although Lalumandier testified that he was not close enough to determine whether the female victim was intoxicated, Officer Reynolds testified that she appeared "possibly a little" intoxicated.  (Docs. # 25 at 9:13-15; 26-1 at 7:14-16).  Taking all of this together, Rettig contends that he and the female victim engaged in virtually identical conduct in the same place at the same time.  (*Id.* at 31-32).  However, only Rettig was arrested.  This disparity arose, on Rettig's telling, because Lalumandier chose to "exercise[] discretion against the person who challenged [his] authority."  (*Id.* at 32).

The fact that Lalumandier did not also arrest the female victim in this case does not indicate that officers typically exercise their discretion not to arrest individuals like Rettig for alcohol intoxication.  Setting aside the question of whether a single non-arrested comparator can provide sufficient proof to trigger the *Nieves* exception, the female victim was not similarly situated to Rettig.  First, Rettig needlessly inserted himself into an

38

already chaotic scene.  As police were tending to the female victim, who was bleeding and visibly upset, Rettig began to taunt her, which eventually provoked a reaction.  (Doc. # 29 at 13:10-45).  The unprovoked nature of Rettig's conduct is an important distinction. Although both Rettig and the female victim shouted profane insults, Rettig initiated the exchange and repeatedly attempted to antagonize the subject of a police scene.  Second, both the female victim and Rettig were warned that further shouting would result in arrest. (*Id.* at 13:55-14:16).  The female victim heeded this warning and stopped yelling.  Rettig, however, continued to shout.  (*Id.* at 14:16-14:27).  Again, Lalumandier instructed Rettig to stop.  (*Id.*).  Undeterred, Rettig shouted "you suck."  (Doc. # 23 at 13:44-13:52). Lalumandier again warned Rettig that if he kept shouting, Lalumandier would "take [Rettig's] ass to jail."  (*Id.*).  Rettig continued shouting and Lalumandier proceeded toward the Academy.  (*Id.* at 13:48-13:57).  Indeed, as Lalumandier made his way toward the apartment complex, Rettig continued to shout.  (*Id.* at 13:57-14:06).   Rettig's repeated refusal to obey the officers' instructions puts his conduct on a much different footing than the female victim's.  *See Ferreiras*, 2026 WL 473994, at *12 (sister and brother were not similarly situated for *Nieves* purposes where, unlike the sister, the brother obeyed police orders to stop interfering with a traffic stop).  Consequently, the female victim was not similarly situated to Rettig for purposes of the *Nieves* exception.  As a result, the fact that she was not arrested cannot provide the kind of objective proof necessary to trigger the *Nieves* exception.

Because Lalumandier had probable cause to arrest Rettig for alcohol intoxication and because Rettig has failed to identify "otherwise similarly situated" comparators or other objective proof that individuals are not ordinarily arrested for similar conduct, his

39

First Amendment claim must fail. *Nieves*, 587 U.S. at 407. Like his Fourth Amendment claims, then, Rettig's First Amendment claim falters at the first step of the qualified immunity analysis.

### E. *Monell* Claim

The City of Newport also moves for summary judgment on Rettig's § 1983 claim of municipal liability. (Doc. # 21 at 14). In his Complaint, Rettig alleges that his arrest was the result of "policy or poor training from those with the decision-making authority to train the officers." (Doc. # 1 ¶ 65). Additionally, Rettig claims that Newport is liable under § 1983 because "[t]hose with the proper decision-making authority ratified the Defendants' actions, and they further failed to discipline the officers" for their conduct. (*Id.* ¶ 66).

To hold a municipality like Newport liable under § 1983, a plaintiff "must show (1) that [he] suffered a constitutional violation and (2) that a municipal policy or custom directly caused the violation." *Hardrick v. City of Detroit*, 876 F.3d 238, 243 (6th Cir. 2017) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690-92 (1978)). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). A municipality may not be subject to liability on a *respondeat superior* theory. *Pineda v. Hamilton Cnty.*, 977 F.3d 483, 495 (6th Cir. 2020) (citing *Bd. of Cnty. Cm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997)).

In this case, summary judgment is appropriate because Rettig has not suffered a constitutional violation. *See Chambers v. Sanders*, 63 F.4th 1092, 1101-02 (6th Cir.

2023) ("There can be no liability under *Monell* without an underlying constitutional violation."). Because undisputed facts show that no Newport police officer violated Rettig's First or Fourth amendment rights in conducting his arrest, Newport could not have maintained a policy or custom that was the moving force behind a violation of Rettig's constitutional rights. *See Elder v. Pulaski Cnty.*, No. 6:23-cv-37-REW-HAI, 2024 WL 4652202, at *9 (E.D. Ky. Nov. 1, 2024) (citing *id.*). As a result, there is no need to reach the second step of the *Monell* analysis and Newport is entitled to judgment as a matter of law.

### F.    State-Law Battery Claim

The final count of Rettig's Complaint asserts a claim for battery under Kentucky law against Lalumandier. (Doc. # 1 ¶¶ 82-87). Lalumandier argues that he is entitled to summary judgment on this claim because he had probable cause to arrest Rettig and Rettig does not claim that Lalumandier used more force than necessary to effectuate the arrest. Rather, Rettig's battery theory is premised on his contention that, because Lalumandier lacked probable cause to arrest Rettig, any use of force—including the use of handcuffs—constituted battery. (See Doc. # 1 ¶¶ 83-84).

Rettig did not respond to Lalumandier's motion for summary judgment on his battery claim. Under Local Rule 7.1(c), this failure "may be grounds for granting the motion." Furthermore, the Sixth Circuit's "jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim where a plaintiff fails to address it in response to a motion for summary judgment." *Brown*, 545 F. App'x at 372 (citing *Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011)). Because Rettig abandoned his battery claim, the Court will grant summary judgment to Lalumandier. *See*

*Knittel v. First Fin. Mortgage Corp.*, 08-cv-44-JBC, 2009 WL 1702174 (E.D. Ky. June 17, 2009) ("By failing to respond specifically to Citi mortgage's arguments on those claims, the plaintiffs have abandoned them, and the court will grant summary judgment to Citi mortgage.") (citing *National Information and Communications Equipment Network, Inc. v. Willigan*, No. 06-cv-28-DLB, 2007 WL 2979928, at *10 (E.D. Ky. Oct. 11, 2007) (additional citations omitted)).

## IV. CONCLUSION

Accordingly, for the reasons stated herein, **IT IS ORDERED** that:

(1)    Defendants Ronald Lalumandier and the City of Newport's Motion for Summary Judgment (Doc. # 21) is **GRANTED**;

(2)    A separate **JUDGMENT** in favor of Defendants shall be filed contemporaneously herewith; and

(3)    This matter is **DISMISSED** and **STRICKEN** from the Court's active docket.

This 9th day of June, 2026.



Signed By:

*David L. Bunning*   DB

**Chief United States District Judge**

G:\Judge-DLB\DATA\ORDERS\Cov2024\24-215 MOO re MSJ.docx

42